**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DOZIER LAW FIRM LLC, on behalf of itself
and all others similarly situated,

        Plaintiff,

      v.

GRAY TELEVISION, INC.; HEARST
COMMUNICATIONS; NEXSTAR MEDIA
GROUP, INC.; TEGNA INC.; TRIBUNE
MEDIA COMPANY; and SINCLAIR
BROADCAST GROUP, INC.,

        Defendants.

Case No. 1:18-cv-05392

Hon. Virginia M. Kendall

**NEXSTAR MEDIA GROUP, INC.'S ANSWER TO PLAINTIFF DOZIER LAW FIRM
LLC'S ANTITRUST CLASS ACTION COMPLAINT**

Defendant Nexstar Media Group, Inc. ("Nexstar") through its undersigned counsel of record, answers and responds ("Answer") to Dozier Law Firm LLC's ("Plaintiff") Antitrust Class Action Complaint ("Complaint") as follows:

Except as otherwise expressly recognized herein, Nexstar denies each and every allegation contained in the Complaint. Nexstar states that the headings, sub-headings, images, and footnotes in the Complaint do not constitute well-pleaded allegations of fact and therefore require no response. To the extent a response is required, Nexstar states that cited articles and documents speak for themselves, and Nexstar otherwise denies the allegations in the headings, sub-headings, images, and footnotes in the Complaint. Nexstar expressly reserves the right to seek to amend or supplement its Answer as may be necessary.

## INTRODUCTION

1.    This antitrust action concerns the illegal and anticompetitive practices of Defendants Gray Television, Inc., Hearst Communications, Nexstar Media Group, Inc., Tegna

Inc., Tribune Media Company, and Sinclair Broadcast Group, Inc. (collectively, "Defendants"), who engaged in unlawful collusion and conspired to artificially inflate the price of purchasing local television advertisements in violation of Section l of the Sherman Act, 15 U.S.C. § 1.

**ANSWER**:  Nexstar denies the allegations contained in Paragraph 1.

2.     Plaintiff seeks to represent a Class of all persons and entities in the United States who paid for all or a portion of advertisement time on local TV provided by Defendants from at least January 1, 2014, until the effects of their unlawful conduct cease (the "Class Period").

**ANSWER**:  Paragraph 2 states legal conclusions to which no response is required.

3.     Since at least January 1, 2014, Defendants unlawfully coordinated their efforts to artificially inflate prices for television commercials.  Rather than lawfully vying for advertisers through price competition, Defendants and their co-conspirators instead conspired to fix prices by sharing proprietary information, thereby reducing competition in the market.

**ANSWER**:  Nexstar denies the allegations contained in Paragraph 3.

4.     On July 26, 2018, *The Wall Street Journal* and other media outlets reported that Sinclair Broadcast Group Inc., Tribune Media Co., and certain independent local television stations are the subjects of an ongoing United States Department of Justice ("DOJ") investigation regarding whether communication between the stations' ad sales teams led to higher rates for TV commercials.

**ANSWER**:  Nexstar admits that *The Wall Street Journal* published an article on July 26, 2018 purporting to describe an investigation by the United States Department of Justice, and refers to that article for its contents.

## JURISDICTION AND VENUE

5.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

**ANSWER**:  Paragraph 5 states legal conclusions to which no response is require.  To the extent a response is required, Nexstar admits that Plaintiff purports to bring a claim arising under Section 1 of the Sherman Act, 15 U.S.C. § 1 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

6.     This Court has jurisdiction over the federal Sherman Act claim pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

**ANSWER**:  Paragraph 6 states legal conclusions to which no response is required.

7.     Plaintiff seeks to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States.

**ANSWER**:   The allegations contained in Paragraph 7 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Nexstar admits that Plaintiff seeks the relief described, but denies the remaining allegations in this Paragraph, including denying that the Complaint describes activity giving rise to any claim, that Plaintiff can maintain its case on behalf of any class, and that Plaintiff is entitled to any relief.

8.     This Court has personal jurisdiction over Defendants subject to the nationwide service provisions of Section 12 of the Clayton Act, 15 U.S.C. § 22.  Furthermore, Defendants have engaged in the unlawful acts described in this Complaint with the foreseeable or intended effect of causing substantial economic harm to purchasers of television advertisements in the state of Illinois.

**ANSWER**:  The first sentence of Paragraph 8 states legal conclusions to which no response is required.  Nexstar denies the allegations in the second sentence of Paragraph 8.

9.      Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 28 U.S.C. §§ 15, 22, and 26, and pursuant to 28 U.S.C. § 1391(b), (c), and (d). Defendants are registered to do business, transacted business, were found, and have agents in this District.

**ANSWER**:  Paragraph 9 states legal conclusions to which no response is required.

10.      Defendants' activities were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States.

**ANSWER**:  Paragraph 10 states legal conclusions to which no response is required.

## PARTIES

**Plaintiffs**

11.      Plaintiff Dozier Law Firm LLC is a law firm located in Macon, Georgia. During the Class Period, Plaintiff purchased advertisement time directly from one or more of the Defendants or their co-conspirators and has suffered monetary loss as a result of the antitrust violations alleged herein.

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 11 and therefore denies those allegations.

**Defendants**

12.      Defendant Gray Television, Inc. ("Gray") is a television broadcast company headquartered at 4370 Peachtree Road, NE, Suite 400, Atlanta, Georgia 30319. Gray owns and operates television stations and digital assets in the United States. As of February 23, 2018, Gray owned and operated television stations in 57 television markets, broadcasting approximately 200 program streams, including approximately 100 channels affiliated with the CBS Network, the

NBC Network, the ABC Network, and the FOX Network. On June 23, 2018, Gray entered into a merger agreement with, among others, Ray com Media, Inc. Giving effect to the merger and prior to divestitures of stations due to market overlaps, Gray expects to own and/or operate 142 full-power television stations serving 92 markets. Upon completion, Gray expects to reach approximately 24 percent of U.S. television households through nearly 400 separate program streams including approximately 165 affiliates of the ABC/NBC/CBS/FOX networks, and over 100 affiliates of the CW, MyNetwork, and MeTV networks.

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 12 and therefore denies those allegations.

13.     Defendant Hearst Corporation ("Hearst"), headquartered at 300 West 57th Street, New York, New York 10019, is a diversified media and information Company. Hearst operates television stations and cable networks throughout the United States.

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 13 and therefore denies those allegations.

14.     Defendant Nexstar Media Group ("Nexstar"), headquartered at 545 East John Carpenter Freeway, Suite 700, Irving, Texas 75062, operates as a television broadcasting and digital media company in the United States. As of December 31, 2017, the company owned, operated, programmed, or provided sales and other services to 170 television stations in 100 markets.

**ANSWER**:  Nexstar admits the allegations contained in Paragraph 14.

15.     Defendant Tegna, Inc. ("Tegna") is a broadcasting, digital media, and marketing services company headquartered at 7950 Jones Branch Drive, McLean, Virginia 22107. Tegna owns and operates 47 television stations in 39 markets across the United States.

**ANSWER**: Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 15 and therefore denies those allegations.

16.    Defendant Tribune Media Company ("Tribune"), headquartered at 515 North State Street, Chicago, Illinois 60654, operates through its subsidiaries as a media and entertainment company in the United States. It offers news, entertainment, and sports programming through Tribune Broadcasting local television stations, including FOX television affiliates, CW Network television affiliates, CBS television affiliates, ABC television affiliates, MY television affiliates, NBC television affiliates, and independent television stations; and television series and movies on WGN America, a national general entertainment cable network. Tribune owns 43 broadcast television stations in approximately 35 cities.

**ANSWER**: Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 16 and therefore denies those allegations.

17.    Defendant Sinclair Broadcast Group., Inc. ("Sinclair"), headquartered at 10706 Beaver Dam Road, Hunt Valley, Maryland 21030, operates as a television broadcast company in the United States. As of December 31, 2017, it owned, operated, and/or provided services to 191 stations in 89 markets, which broadcast 601 channels.

**ANSWER**: Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 17 and therefore denies those allegations.

## AGENTS AND CO-CONSPIRATORS

18.    The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

**ANSWER**: Nexstar denies the allegations contained in Paragraph 18.

19.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

**ANSWER**:  Nexstar denies the allegations contained in Paragraph 19.

20.     Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

**ANSWER**:  Nexstar denies the allegations contained in Paragraph 20.

## FACTUAL ALLEGATIONS

### A.     The Department of Justice Investigates Defendants

21.     On July 26, 2018, *The Wall Street Journal* reported that the Department of Justice is investigating Defendants Sinclair and Tribune, among other local television station owners, to determine if these station owners engaged in unlawful behavior to artificially raise prices for television commercials.  Defendants Hearst, Nexstar, and Tegna are also involved in the DOJ probe according to reports. Specifically, the DOJ's investigation targets whether there were "coordinated efforts when [the local television stations'] ad sales teams communicated with each other about their performance, potentially leading to higher rates for TV commercials."

**ANSWER**:  Nexstar admits that the articles cited in Paragraph 21 purport to describe an investigation by the United States Department of Justice and contain the language quoted in Paragraph 21.  Nexstar refers to those articles for their contents.

22.     This DOJ investigation grew out of the Justice Department Antitrust Division's earlier examination of Sinclair's proposed $3.9 billion acquisition of Tribune. Despite earlier speculation that the approval was imminent, the Justice Department never approved the merger. In fact, in early July 2018, Federal Communications Chairman Ajit Pai indicated there were

"serious concerns" regarding the merger, and issued an order for a hearing on the deal in front of an administrative judge—signaling to many insiders that the proposed merger is dead.

**ANSWER**:  Nexstar admits the articles cited in Paragraph 22 contain the quoted language. Nexstar refers to those articles for their contents.  Nexstar otherwise lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 22 and therefore denies those allegations.

### B. The Local Television Advertising Market

23.     In the United States, "local television" is comprised of larger parent companies who own multiple local TV stations. The individual stations carry programming distributed through their broadcast platform, which can be programming provided by national broadcast networks, local news programs, or any variety of other programming.

**ANSWER**:  Nexstar denies the allegations in Paragraph 23.

24.     In 2004, the five largest companies in the local TV market—Sinclair, Nexstar, Gray, Tegna, and Tribune—collectively owned, operated, or serviced 179 full-power stations. In 2014 this number grew to 378, and in 2016 these five companies controlled 443 stations.

**ANSWER**:  Nexstar admits the articles cited in Paragraph 24 contain the quoted figures. Nexstar refers to those articles for their contents and otherwise denies each and every allegation in Paragraph 24.

25.     Broadcasting companies, such as Defendants, rely on the sale of commercial time on their stations as a vital source of revenue. Local TV station owners attempt to meet the needs of advertisers by delivering to significant audiences in key demographics.

**ANSWER**:  Nexstar admits that broadcasting companies can sell commercial time, which is a source of revenue, and that local TV stations owners attempt to meet the needs of advertisers. Nexstar otherwise denies each and every allegation in Paragraph 25.

26.     The actual amount of revenue achieved from local TV advertising varies substantially depending a number of variables. One factor that significantly affects revenue is the station's ability to attract and retain local, national, and network advertisers.

**ANSWER**:  Nexstar admits the amount of revenue from local TV advertising varies depending on a number of variables and that one such factor is attracting and retaining advertisers. Nexstar otherwise denies the allegations in Paragraph 26.

27.     The television industry continues to struggle as it adapts to a rapidly changing market of consumers whose media preferences have drifted away from traditional sources and moved toward digital channels. Local TV has been grappling with ratings erosion and "cord-cutting" viewers cancelling their television subscriptions. This continually-shifting landscape has added significant pressure on profit margins.

**ANSWER**:  Nexstar refers to the sources cited in Paragraph 27 for their contents and otherwise denies each and every allegation in Paragraph 27.

28.     In recent years, television broadcasting companies have experienced a significant slowing of growth in advertising revenues. But even with this decrease in television advertising spending, total revenue in the U.S. local television industry are expected to reach $27.7 billion in 2018, up from $26.2 billion in 2017.

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 28 and therefore denies those allegations.

29.    Given the stalled growth in spending on television advertising, Defendants responded to these lackluster advertisement sales through unlawfully colluding on pricing, thereby forcing Plaintiff and members of the Class to pay artificially high prices for advertising on local television.

**ANSWER**:  Nexstar denies the allegations in Paragraph 29.

**1.    The Structure and Characteristics of The Market For Local Television Advertising Supports The Existence of a Conspiracy**

30.    The structure and other characteristics of the market for local television advertising make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive. Specifically, the local television advertising market (1) is in an industry that has been rapidly consolidating and is becoming increasingly concentrated; (2) has high barriers to entry; and (3) is comprised of participants who had motives and ample opportunities to conspire.

**ANSWER**:  Nexstar denies the allegations in Paragraph 30.

**a.    Rapid Consolidation of the Local TV Market**

31.    The more highly-concentrated a market is, the more susceptible it is to collusion. The local TV market has undergone a period of rapid concentration in recent years, in response to advertisers' decreased spending.

**ANSWER**:  Nexstar denies the first sentence of Paragraph 31. Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in the second sentence of Paragraph 31 and therefore denies those allegations.

32. The year 2013 marked a massive change in local television, when "big owners of local TV stations got substantially bigger, thanks to a wave of station purchases."

**ANSWER**: Nexstar admits the article cited in Paragraph 32 contains the quoted language. Nexstar refers to that article for its content and otherwise denies each and every allegation in Paragraph 32.

33. Owners of stations have not shied away regarding their intent to push consolidation as far as possible. In early 2018, local television station owner E.W. Scripps Co., indicated that its "priority is in-market consolidation to create duopolies."

**ANSWER**: Nexstar admits the article cited in Paragraph 33 contains the quoted language. Nexstar refers to that article for its content and otherwise denies each and every allegation in Paragraph 33.

34. Additional proposed mergers, if completed, will further concentrate the market. On June 25, 2018, Defendant Gray agreed to buy fellow television station owner Raycom Media Inc. in a $3.65 billion deal that would create a company that doubles Gray's reach to nearly a quarter of U.S. TV households.

**ANSWER**: Nexstar admits the article cited in Paragraph 34 contains the quoted figures. Nexstar refers to that article for its content. Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the other allegations contained in Paragraph 34 and therefore denies those allegations.

**b.    Barriers to Entry in the Local Television Market**

35. If parties engage in an arrangement that elevates the prices of a product above competitive levels, this should in typical circumstances attract new competitors to enter the market, seeking to fill the price gap and benefit from supracompetitive pricing. However, when barriers to

entry are high, new entrants are far less likely to enter the market. Barriers to entry help in the formation and maintenance of cartels and market-allocation agreements, as has happened in the local television market.

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35 and therefore denies those allegations.

36.     Although certain specific barriers to market entry have been lowered through the expansion and advancement of technology, new entrants to the broadcasting markets face six critical barriers, including: governmental policy; the presence of dominant broadcasters; access to content; audience behavior; consumer costs; and capital requirements.

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36 and therefore denies those allegations.

37.     Regulatory and/or administrative practices by the government when issuing broadcasting licenses may restrict market access and distort competition.

**ANSWER**: Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37 and therefore denies those allegations.

38.     The existing power structure of dominant broadcasters also proves to be a barrier to entry. These dominant broadcasters have long-established relationships with their viewers—and most likely also hold sway with advertisers. Any potential entrants in the market would have to offer more compelling deals than the existing broadcasters in order to gain market share.

**ANSWER**:  Nexstar denies the allegations in Paragraph 38.

39.     Larger companies are also better able to negotiate programming deals with networks or syndicators, whereas a newer entrant to the market would be required to invest significant capital and time in establishing itself before it could work with networks.

**ANSWER**: Nexstar denies the allegations in Paragraph 39.

40.     Reasonably-priced access to desired programming is yet another barrier. Content acquisition, which is critical to pull in viewers, constitutes a significant cost to new market competitors.

**ANSWER**: Nexstar denies the allegations in Paragraph 40.

41.     Commercial broadcasters' operations are primarily financed through advertising fees, so it is by necessity that they locate and retain an audience base that will also attract a sufficient number of advertisers. Therefore, these new broadcasters in the market would face the difficult task of providing programming compelling enough to convince viewers to change their viewing and channel habits.

**ANSWER**: Nexstar admits that one source of revenue is advertising fees. Nexstar denies the allegations in the second sentence of Paragraph 41.

42.     The cost and inconvenience encountered by customers who try switching between different television broadcasters has the potential to discourage them from altering their established patterns of viewing. As one example, a consumer switching cable providers might face costs of replacing the set-top boxes or might have to trade in and upgrade equipment.

**ANSWER**: The allegations in Paragraph 42 are hypothetical, and Nexstar denies them on that basis.

43.     Finally, it would require considerable capital to break into the local television market. The total expense, time, and technical sophistication for a potential competitor to access the economies of scale and the audience base already obtained by Defendants would be immense. To the extent these costs are prohibitively high, they constitute a serious entry barrier.

**ANSWER**: Nexstar denies the allegations in Paragraph 43.

       **c.**       **Defendants Had Motives and Opportunities to Conspire with Each Other**

44.     In 2017, television advertising sales in the U.S. saw the steepest drop outside of a recession in at least 20 years, while the sales at cable networks dropped for the first time in almost a decade. Industry specialists do not predict any rebound or pickup in 2018, excluding huge, cyclical events like the Olympics and the midterm elections.

     **ANSWER**:  Nexstar admits the article cited in Paragraph 44 contains the quoted figure and refers to that article for its content.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the other allegations contained in Paragraph 44 and therefore denies those allegations.

45.     The online video advertising market is gaining momentum as the decline in television viewership dips even further down. Virtually all new advertising money entering the marketplace goes toward online advertising, and nearly half of the growth in local video ad spending during the next five years will go to digital platforms. "Television ad sales have fallen even as global advertising grows, leading research firms and analysts to predict that the business may never recover."

     **ANSWER**:  Nexstar admits the article cited in Paragraph 45 contains the quoted language. Nexstar refers to that article for its content and otherwise denies each and every allegation in Paragraph 45.

46.     Sinclair's financial statements reveal the same story. According to Sinclair's most recent 10-K, one primary source of revenue for local television stations is selling commercial inventory on its television stations to advertising customers. Sinclair also admits to the volatility

of such a system, pointing to the uncertainty of revenue potentially affecting operating results and its ability to repay its indebtedness.

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 46 and therefore denies those allegations.

47.    Given that Defendants' business model depends to a large extent on the revenue from local television advertising to sustain daily operations, in the face of declining sales, Defendants had good reason and sufficient motivation to conspire to artificially raise the prices of local TV advertisements.

**ANSWER**:  Nexstar denies the allegations in Paragraph 47.

48.    There were abundant opportunities for Defendants to meet and conspire with each other under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the conspiracy.

**ANSWER**:  Nexstar denies the allegations in Paragraph 48.

49.    For example, in 2013, when nearly 300 full-power local TV stations were changing hands, many deals resulted in stations in the same market being jointly operated in practice, but separately owned on paper, a practice that has seen explosive growth in recent years. As of 2014, joint service agreements existed between Defendants and other local TV station owners in a minimum of 94 markets—almost half of the 210 local television markets nationwide—up from merely 55 in 2011.

**ANSWER**:  Nexstar admits the article cited in Paragraph 49 contains the quoted figures and refers to that article for its content.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the other allegations contained in Paragraph 49 and therefore denies those allegations.

50. Sinclair has admitted that some of its stations "entered into agreements with other stations in the same market, through which [it] provide[s] programming and operating services[,] . . . sales services[,] and other non-programming operating services."

**ANSWER**: Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50 and therefore denies those allegations.

51. Industry associations such as the Television Bureau of Advertising, Inc. ("TVB"). the National Association of Broadcasters ("NAB"), and the Media Rating Council ("MRC"), all gave Defendants additional ample opportunity to engage in unlawful collusion, through conferences and meetings held by those associations, as well as part of merger negotiations.

**ANSWER**: Nexstar denies the allegations in Paragraph 51.

52. The industry trade association TVB—which includes Defendants Hearst, Nexstar, Sinclair, Tegna, and Tribune—is a "not-for-profit trade association representing America's $21 billion local broadcast television industry." TVB encourages information sharing among employees of broadcast television companies, including Defendants, especially advertising sales representatives. Nexstar's President and CEO serves as the Chairman of TVB.

**ANSWER**: Nexstar admits it is a member of the TVB and that its President and CEO serves as Chairman. Nexstar admits that TVB's website contains the quote contained in the first sentence of Paragraph 52 and refers to the website for its content. Nexstar denies the remaining allegations in Paragraph 52.

53. On November 20, 2017, Defendants Hearst, Nexstar, Sinclair, Tegna, and Tribune announced the creation of the TV Interface Practices or "TIP" Initiative—"an industry work group dedicated to developing standard-based interfaces to accelerate electronic advertising transactions for local TV broadcasters and their media agency partners." On the heels of this announcement,

three Defendant-executives made the following, similar public statements: Nexstar's President and CEO stated that the industry "must work together as an industry"; Sinclair's President and CEO, Chris Ripley, stated "[t]he TIP Initiative demonstrates the industry's shared commitment to working together" to grow their advertising sales; and Tribune's President and CEO, Larry Wert, indicated that, through the TIP Initiative, Defendants could "actively work[] together."

**ANSWER**:  Nexstar admits that the article cited in Paragraph 53 contains the language quoted in the first sentence of that paragraph and that Nexstar's President and CEO stated, "To sustain local television's advantages across all screens and devices, we must work together as an industry to create a more efficient marketplace for advertisers to access local TV inventory in a manner that is cost effective for the buyer, while maintaining the integrity of our product;" Sinclair's President and CEO stated, "The TIP Initiative demonstrates the industry's shared commitment to working together with technology providers and advertising partners to develop open standards-based solutions for efficient automated buying and selling of broadcast TV spot inventory;" and Tribune's President and CEO said, "By actively working together to implement standards-based open APIs and technologies, we will be able to extract efficiencies and create a platform for advertisers to more effectively access our multi-screen inventory and transact business." Nexstar refers to the cited article for its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 53 and therefore denies those allegations.

54.    Sinclair, Tribune, and other broadcast television companies are also members of the NAB, the self-described "premier trade association for broadcasters." Tegna's President and CEO, David Lougee, and Hearst's President, Jordan Wertlieb, both serve on NAB's Executive Committee. Gray TV's Chairman, President, and CEO, Hilton Howell, Nexstar's Chairman,

President and CEO, Perry Sook, Sinclair's President and CEO, Chris Ripley, and Tribune's COO, Kathy Clements, all serve on the NAB Television Board of Directors. NAB hosts numerous meetings and other events for industry members throughout the year, which are attended by Defendants' executives.

**ANSWER**:  Nexstar admits it is a member of NAB and that its President and CEO serves on the NAB Television Board of Directors.  Nexstar further admits that Nexstar executives have attended NAB meetings.  Nexstar admits the cited website contains the quotation in Paragraph 54 and refers to the website for its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 54 and therefore denies those allegations.

55.     Gray TV, Hearst, Nexstar, Sinclair, Tegna, Tribune, and several other local television station owners are also members of MRC, which boasts that one of the "[benefits of MRC membership]" is that "[m]embers are exposed to other members' ideas and thoughts" and that "[m]embers can attend formal education seminars" together.

**ANSWER**:  Nexstar denies that it is a member of MRC, though a different Nexstar entity, Nexstar Broadcasting, is a member.  Nexstar admits the websites cited in Paragraph 55 contain the quoted language and refers to the websites for their content.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 55 and therefore denies those allegations.

## CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

All persons and entities in the United States who paid for all or a portion of the cost of advertisement time directly to Defendants, or any current or former subsidiary or affiliate of Defendants, or any co-conspirator, during the period from at least and including January 1, 2014 until the effects of Defendants' unlawful conduct ceases. Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, agents, co-conspirators, federal governmental entities and instrumentalities of the federal government, and states and their subdivisions, agencies and instrumentalities.

**ANSWER**: Paragraph 56 states legal conclusions to which no response is required. To the extent a response is required, Nexstar denies the allegations.

57. **Numerosity**. While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the class size is numerous given Defendants' substantial nationwide presence.

**ANSWER**: Paragraph 57 states legal conclusions to which no response is required. To the extent a response is required, Nexstar denies the allegations.

58. **Commonality**. Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Class, thereby making class-wide relief appropriate. Such questions of law and fact common to the Class include, but are not limited to:

(a) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to restrict output and fix, raise, maintain or stabilize the prices of local television advertising time;

19

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy;

(d)     The acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(e)     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

(f)     Whether the conduct of Defendants and their co-conspirators as alleged in this Complaint caused injury to the business or property of Plaintiff and the members of the Class;

(g)     The effect of the alleged conspiracy on the cost of local television advertising time during the Class Period;

(h)     Whether the Defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Class;

(i)     The appropriate injunctive and related equitable relief for Plaintiff and the Class; and

(j)     The appropriate class-wide measure of damages.

**ANSWER**:  Paragraph 58 states legal conclusions to which no response is required.  To the extent a response is required, Nexstar denies the allegations.

59.     **Typicality**. Plaintiff s claims are typical of the claims of the members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for local television advertising time provided by Defendants and/or their co-conspirators.

**ANSWER**:  Paragraph 59 states legal conclusions to which no response is required.  To the extent a response is required, Nexstar denies the allegations.

60.    **Adequacy**. Plaintiff s claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff s interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

**ANSWER**:  Paragraph 60 states legal conclusions to which no response is required.  To the extent a response is required, Nexstar denies the allegations.

61.    **Predominance**. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

**ANSWER**:  Paragraph 61 states legal conclusions to which no response is required.  To the extent a response is required, Nexstar denies the allegations.

62.    **Superiority**. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

**ANSWER**:  Paragraph 62 states legal conclusions to which no response is required.  To the extent a response is required, Nexstar denies the allegations.

63. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**ANSWER**: Paragraph 63 states legal conclusions to which no response is required. To the extent a response is required, Nexstar denies the allegations.

## INTERSTATE TRADE AND COMMERCE

64. Billions of dollars of transactions in local television advertisements are entered into each year in interstate commerce in the United States and the payments for those transactions flowed in interstate commerce.

**ANSWER**: Paragraph 64 states legal conclusions to which no response is required. To the extent a response is required, Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 64 and therefore denies those allegations.

65. Defendants' manipulation of the market for the sale of local television advertising had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

**ANSWER**: Nexstar denies the allegations in Paragraph 65.

66. Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for local television advertising.

**ANSWER**: Nexstar denies the allegations in Paragraph 66.

67. Defendants' unlawful conduct has a direct and adverse impact on competition in the United States. Absent Defendants' combination, conspiracy, and/or agreement to manipulate

the market for the sale of local television advertising, the prices of local television advertising would have been determined by a competitive, efficient market.

**ANSWER**:  Nexstar denies the allegations in Paragraph 67.

## FRAUDULENT CONCEALMENT

68.     Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their unlawful conduct, including their collusion to fix, maintain, stabilize, and/or artificially inflate prices for television advertising. The very nature of Defendants' conspiracy was secret and self-concealing. Defendants engaged in market manipulation that could not be detected by Plaintiff and members of the Class.

**ANSWER**:  Paragraph 68 states legal conclusions to which no response is required.  To the extent a response is required, Nexstar denies the allegations in Paragraph 68.

69.     Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their price-fixing conspiracy.

**ANSWER**:  Nexstar denies the allegations in Paragraph 69.

70.     Plaintiff and members of the Class did not know of any facts that would have caused a reasonable person to suspect that Defendants and their co-conspirators were colluding to fix, maintain, stabilize, and/or artificially inflate prices for television advertising.

**ANSWER**:  Nexstar denies the allegation that it had co-conspirators or engaged in collusion to fix, maintain, stabilize, and/or artificially inflate prices for television advertising. Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 70 and therefore denies those allegations.

71.     Plaintiff and the Class members did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein prior

to *The Wall Street Journal's* disclosure of the DOJ investigation of Defendants and their co-conspirators on July 26, 2018.

**ANSWER**:  Nexstar denies the allegation that it engaged in a conspiracy. Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 71 and therefore denies those allegations.

72.     As alleged herein, Defendants' collusion to fix prices in the market for the sale of local television advertising was material to Plaintiff and Class members at all relevant times. Plaintiff or the Class members could not have discovered the violations until shortly before this litigation was commenced because Defendants and their co-conspirators used, and continue to use, deceptive methods to avoid detection and to affirmatively conceal their violations.

**ANSWER**:  Paragraph 72 states legal conclusions to which no response is required.  To the extent a response is required, Nexstar denies the allegations in Paragraph 72.

73.     Plaintiff and Class members reasonably relied on Defendants' knowing, active, and affirmative concealment. As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff s and the Class members' claims have been tolled.

**ANSWER**:  Paragraph 73 states legal conclusions to which no response is required.  To the extent a response is required, Nexstar denies the allegations in Paragraph 73.

## PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY

74.     Plaintiff and Class members purchased television advertising time from one or more Defendants or their co-conspirators in the United States.

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 74 and therefore denies those allegations.

75.     Sinclair and Tribune are horizontal competitors in the market for the sale of television advertising in the United States. Together, the media companies reach more than 80% of households in the United States.

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 75 and therefore denies those allegations.

76.     Rather than compete on price as horizontal competitors would in an unrestrained market, Defendants intended to restrain trade, and actually did restrain trade, through their common scheme to achieve their unlawful purpose and objective of inflating, fixing, stabilizing, and/or maintaining advertising rates.

**ANSWER**:  Nexstar denies the allegations contained in Paragraph 76.

77.     There is no legitimate business justification for, or procompetitive benefits of, Defendants' unreasonable restraint of trade.

**ANSWER**:  The allegations in Paragraph 77 state legal conclusions to which no response is required.  To the extent a response is required, Nexstar denies the allegations in Paragraph 77.

78.     Defendants' antitrust conspiracy, conspiracy to monopolize, attempted monopolization, and monopolization had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to local television advertising;

(b)     The prices of local television advertising have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Plaintiff and Class members—purchasers of local television advertising time—have been deprived of the benefits of free and open competition; and

(d)     Plaintiff and Class members—purchasers of local television advertising time—paid artificially inflated prices.

**ANSWER**: Nexstar denies the allegations contained in Paragraph 78.

79.     Absent Defendants' and their co-conspirators' collusion, those purchasing television advertising would have transacted at competitive prices and reaped the benefits of competition.

**ANSWER**:  Nexstar denies the allegations contained in Paragraph 79.

80.     The precise amount of the overcharge impacting the prices of local television advertising time paid by Plaintiff and the Class can be measured and quantified using well-accepted models.

**ANSWER**:  Nexstar denies the allegations contained in Paragraph 80.

81.     As a direct, intended, foreseeable, and proximate result of Defendants' unlawful conspiracy and acts in furtherance of their conspiracy, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for local television advertising time than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**ANSWER**:  The allegations in Paragraph 81 state legal conclusions to which no response is required.  To the extent a response is required, Nexstar denies the allegations in Paragraph 81.

## COUNT ONE

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

### (Conspiracy in Restraint of Trade)

82.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

**ANSWER**:  Nexstar repeats the responses set forth above as if fully set forth herein.

83.     From at least January 1, 2014, until the effects of their unlawful conduct ceases, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regards to local television advertising in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER**:  Nexstar denies the allegations contained in Paragraph 83.

84.     The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially high levels the prices they charged for local television advertising time in the United States.

**ANSWER**:  Nexstar denies the allegations contained in Paragraph 84.

85.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

(a)     participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of local television advertisements in the United States; and

(b)     participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

**ANSWER**:  Nexstar denies the allegations contained in Paragraph 85.

86. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, raise, or stabilize prices of local television advertising time.

**ANSWER**: Nexstar denies the allegations contained in Paragraph 86.

87. Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for local television advertisements has been restrained, suppressed, and/or eliminated;

(b) Prices for local television advertisement time provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c) Plaintiff and Class members who purchased local television advertisement time from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

**ANSWER**: Nexstar denies the allegations contained in Paragraph 87.

88. Plaintiff and Class members have been injured and will continue to be injured in their business and property by paying more for local television advertising time purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

**ANSWER**: Nexstar denies the allegations contained in Paragraph 88.

89. The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

**ANSWER**: Paragraph 89 states legal conclusions to which no response is required. To the extent a response is required, Nexstar denies the allegations.

90.     Plaintiff and Class members are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

**ANSWER**:  Nexstar denies the allegations contained in Paragraph 90.

### PRAYER FOR RELIEF

Nexstar denies that Plaintiff's purported class is certifiable or that Plaintiff or the members of the purported class suffered injury or damage of any kind, and further denies that Plaintiff or the putative members of the purported class are entitled to relief of any kind, including but not limited to any of the relief sought in paragraphs (A) through (F) of their prayer for relief.

### JURY TRIAL DEMAND

To the extent any response is required to Plaintiff's Jury Trial Demand, Nexstar admits that Plaintiff purports to demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b).

### AFFIRMATIVE DEFENSES

Without admitting liability as to any of the claims asserted in the Complaint, and without assuming the burden of proof on any claims, defenses, or legal or factual issues that otherwise would rest with Plaintiff, Nexstar asserts the following affirmative and other defenses.  Nexstar's investigation in this matter is ongoing, and Nexstar reserves the right to supplement or modify any portion of this Answer, including but not limited to by asserting additional affirmative or other defenses or claims not yet asserted herein, at any time and consistent with the Federal Rules of Civil Procedure.

**DEFENSE 1.**  Plaintiff and the putative class members' claims are barred, in whole or in part, because they lack Article III standing to bring some or all of their claims.

**DEFENSE 2.**  Plaintiff and the putative class members lack standing to bring claims for antitrust violations because, among other reasons, Plaintiff and the putative class members have failed to

plead facts showing a direct causal connection between the challenged conduct and their alleged injury and because Plaintiff and the putative class members have not suffered antitrust injury.

**DEFENSE 3.** Plaintiff and the putative class members' claims are barred, in whole or in part, because they cannot be maintained as a class action.

**DEFENSE 4.** The Complaint fails to state a claim upon which relief can be granted.

**DEFENSE 5.** Plaintiff and the putative class members have failed to allege fraudulent concealment with the particularity required by Federal Rule of Civil Procedure 9(b).

**DEFENSE 6.** Plaintiff and the putative class members' claims are barred, in whole or in part, by the statutes of limitation applicable to their claims.

**DEFENSE 7.** Plaintiff and the putative class members' claims are barred, in whole or in part, by the doctrine of unclean hands, waiver, laches, or estoppel.

**DEFENSE 8.** Plaintiff and the putative class members' claims are barred, in whole or in part, by the doctrines of *in pari delicto*, involvement, participation, equal involvement, or complete involvement.

**DEFENSE 9.** Plaintiff and the putative class members' claims to certain remedies are barred, in whole or in part, to the extent that they have waived, under any applicable contract or otherwise, their rights to those remedies, including but not limited to treble damages and attorneys' fees.

**DEFENSE 10.** Plaintiff and the putative class members' claims are barred, in whole or in part, by the doctrines of accord and satisfaction, release, or settlement.

**DEFENSE 11.** Plaintiff and the putative class members' claims are barred, in whole or in part, by reason of their ratification of, or acquiescence, agreement, or consent to Nexstar's alleged conduct.

**DEFENSE 12.** Plaintiff and the putative class members' claims are barred to the extent that they have agreed to arbitration or agreed to a different forum for the resolution of their claims.

**DEFENSE 13.** Plaintiff and the putative class members' claims are barred, in whole or in part, because they have not suffered an actual injury or damages due to any act or omission of Nexstar.

**DEFENSE 14.** Plaintiff and the putative class members' claims are barred, in whole or in part, because they have not suffered an injury or damages legally or proximately caused by any act or omission of Nexstar.

**DEFENSE 15.** Plaintiff and the putative class members' claims are barred because the conduct they challenge is not *per se* illegal, and they fail to allege, and cannot prove, any cognizable geographic and/or product market for the purpose of asserting a claim against Nexstar.

**DEFENSE 16.** Plaintiff and the putative class members' claims are barred, in whole or in part, because there has been no injury to competition either in fact or as alleged in the Complaint.

**DEFENSE 17.** Plaintiff and the putative class members' claims are barred, in whole or in part, because Nexstar's actions did not lessen competition in the relevant market.

**DEFENSE 18.** Plaintiff and the putative class members' claims are barred, in whole or in part, because the alleged conduct complained of would have been lawful, justified, bona fide business competition, and procompetitive, and was carried out in furtherance of legitimate business interests.

**DEFENSE 19.** Plaintiff and the putative class members' claims are barred, in whole or in part, because the pro-competitive benefits of the conduct alleged by Plaintiffs outweigh any alleged anti-competitive effects.

**DEFENSE 20.** At all times relevant, Nexstar acted in good faith and without knowledge of any wrongful acts or intents.

**DEFENSE 21.**  Plaintiff and the putative class members' claims are barred because any damages suffered by Plaintiff and the putative class members are solely and proximately caused by the operation of external economic factors and/or forces in the marketplace over which Nexstar had no control, and not by any act or omission attributable to Nexstar.

**DEFENSE 22.**  Plaintiffs and the putative class members' claimed injuries or damages, if any, were caused solely and proximately by the acts and omissions of other persons or entities unaffiliated with Nexstar.

**DEFENSE 23.**  To the extent that any actionable conduct occurred, Plaintiff and the putative class members' claims are barred because all such conduct would have been committed by individuals acting ultra vires.

**DEFENSE 24.**  Plaintiff and the putative class members' claims are barred, in whole or in part, because they failed to use reasonable means to avoid any damage and also failed to take appropriate and necessary steps to mitigate damages.

**DEFENSE 25.**  Plaintiff and the putative class members' claims should be dismissed to the extent that they are barred, in whole or in part, because any claimed injury or damage has been offset by benefits they received.

**DEFENSE 26.**  Plaintiff and the putative class members' claims are barred, in whole or in part, to the extent that they seek damages that are duplicative of damages sought in other actions.

**DEFENSE 27.**  Plaintiff and the putative class members' claims for damages are barred, in whole or in part, to the extent they have not suffered damages and their alleged damages are speculative, cannot be ascertained with reasonably certainty, or are incapable of proof.

**DEFENSE 28.**  Without admitting the existence of any contract, combination, or conspiracy in restraint of trade, Nexstar avers that it is entitled to set off any amounts paid to Plaintiff and the

putative class members by any other defendants who have settled, or do settle, any claims in this action.

**DEFENSE 29.** To the extent that Plaintiff and the putative class members seek to collect treble damages, attorneys' fees and expenses, and other monetary relief from Nexstar, they seek a recovery that is so grossly excessive and inequitable that it would violate the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

**DEFENSE 30.** Nexstar has engaged in no behavior that it knew to be, or could reasonably foresee would ever be found to be, improper or forbidden under the antitrust laws, and thus neither actual nor treble damages may be awarded against it.

**DEFENSE 31.** Plaintiff and the putative class members' claims for injunctive or other equitable relief are barred, in whole or in part, because they have available an adequate remedy at law.

**DEFENSE 32.** Plaintiff and the putative class members' claims for injunctive relief are barred, in whole or in part, insofar as they seek to enjoin alleged events that have already transpired without the requisite showing of threatened future harm or continuing harm.

**DEFENSE 33.** Plaintiff and the putative class members' claims are barred, in whole or in part, because the claims are governed by the rule of reason, and they have not alleged and cannot prove the elements of a rule of reason claim.

**DEFENSE 34.** Plaintiff and the putative class members' claims should be dismissed to the extent that they are barred, in whole or in part, for failure to join indispensable parties.

**DEFENSE 35.** Plaintiff and the putative class members' claims are improperly joined, including within the meaning of Federal Rule of Civil Procedure 20, because they did not arise out of the same transaction, occurrence, or series of transactions or occurrences and/or do not involve questions of law or fact common to all defendants.

**<u>DEFENSE 36.</u>**  This Court lacks subject matter jurisdiction, pursuant to the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a, to the extent that Plaintiff and the putative class members' claims encompass conduct involving foreign commerce.

**<u>DEFENSE 37.</u>**  Nexstar incorporates by reference and asserts to the extent applicable all other affirmative defenses set forth in the Answers of each of the other defendants.

**<u>DEFENSE 38.</u>**  Nexstar hereby gives notice that it intends to rely upon any other defense that may become available or appear during the discovery process in this case and hereby reserves its right to amend its Answer to assert any such defenses.

**<u>DEFENSE 39.</u>**  Nexstar hereby reserves the right to assert other defenses as this action proceeds up to and including the time of trial and any appeal thereof.

Dated:  September 4, 2018                                    Respectfully submitted,


                                                            KIRKLAND & ELLIS LLP

                                                            By:  /s/ *Eliot A. Adelson*
                                                            _____

                                                            Eliot A. Adelson (admitted *pro hac vice*)
                                                            555 California Street, 29th Floor
                                                            San Francisco, CA 94104
                                                            Telephone: (415) 439-1400
                                                            Facsimile: (415) 439-1500
                                                            eliot.adelson@kirkland.com

                                                            James H. Mutchnik
                                                            300 North LaSalle
                                                            Chicago, IL 60654
                                                            Telephone: (312) 862-2000
                                                            Facsimile: (312) 862-2200
                                                            james.mutchnik@kirkland.com

                                                            *Counsel for Defendant Nexstar Media Group,*
                                                            *Inc.*

## CERTIFICATE OF SERVICE

I, hereby certify that on September 4, 2018, the foregoing document was filed electronically through the Court's Electronic Case Filing System. Service of this document is being made upon all counsel of record in this case by the Notice of Electronic Filing issued through the Court's Electronic Case Filing System on this date.

I also certify that a copy was served by e-mail on the following:

| CRAVATH SWAINE & MOORE LLP | COOLEY LLP |
|---|---|
| Evan R. Chesler<br>Julie A. North<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019<br>echesler@cravath.com<br>*jnorth@cravath.com*<br><br>*Counsel for Defendant Hearst Television Inc. (erroneously sued as Hearst Communications)* | Mazda K. Antia<br>4401 Eastgate Mall<br>San Diego, CA 92121<br>mantia@cooley.com<br><br>John C. Dwyer<br>3175 Hanover Street<br>Palo Alto, CA 94304<br>dwyerjc@cooley.com<br><br>J. Parker Erkmann<br>1299 Pennsylvania Ave., NW<br>Suite 700<br>Washington, D.C. 2004<br>perkmann@cooley.com<br><br>*Counsel for Defendant Gray Television, Inc.* |

/s/ *Eliot A. Adelson*
Eliot A. Adelson